THE PEOPLE OF PUERTO RICO, Plaintiff and Appellee, *v.* ARTURO PÉREZ, Defendant and Appellant.

No. 7829. Argued July 13, 1939.—Decided November 30, 1939.

*Benjamín Ortiz* and *R. Fernández Garzot* for appellant. *R. A. Gómez, Prosecuting Attorney,* and *Luis Janer, Assistant Prosecuting Attorney,* for The People, appellee.

MR. CHIEF JUSTICE DEL TORO delivered the opinion of the Court.

Inocencia Peña Cruz, a resident of Fajardo, filed a complaint in the Municipal Court of Fajardo against Arturo Pérez, charging him with an offense of abandonment of minors, committed as follows:

". . . said defendant Arturo Pérez, then and there, unlawfully, wilfully and maliciously and without any legal excuse whatsoever, has failed to provide the indispensable food, medical attention and clothing for his natural children William Peña, eight years of age, and Luz Delia Peña who is five years of age, born of the relations between the complainant herein and the defendant, Arturo Pérez."

Upon being condemned by the municipal court, the defendant appealed to the District Court of Humacao where, after the trial *de novo* had been held, he was again adjudged guilty. He then appealed to this Court.

The judgment of the district court was entered in the following terms:

"The court, after examining the complaint and having heard the answer of the defendant and having weighed the evidence presented and admitted, pronounces Arturo Pérez, Insular Policeman, guilty of an offense of abandonment and neglect of minors and imposes upon him a fine of one hundred dollars and in its default sentences him to one day in jail for each dollar which he fails to pay plus the costs; suspending this judgment as long as the defendant provides a monthly sum of twenty dollars as alimony for his children William and Luz Delia Peña, which sum the defendant must deposit in the office of the clerk of this court in advance at the disposal of his above mentioned children.

"And it is ordered that if the defendant should fail to comply with the conditions of this alimony portion, he be taken from this court of justice, if he should fail to pay the fine imposed upon him, to the district jail where he shall be delivered to the warden of said institution to be confined therein for the term fixed in this judgment."

In his brief, the appellant assigns eight errors to the trial court, committed, the first one, in weighing the evidence; the second, in deciding that the paternity of the defendant was established; the third, in not finding the evidence suffi-

cient to raise at least a reasonable doubt in regard to the paternity; the fourth, in permitting the presentment of evidence tending to establish the filiation of the alleged illegitimate children of the defendant; the fifth, in permitting witness Inocencia Peña to testify in regard to her alleged sexual relations with the defendant; the sixth, in not permitting witnesses Martínez and González to testify as to the reputation of the accused in the community; the seventh, in refusing to admit evidence in regard to the resemblance or nonresemblance between the defendant and his alleged children and the eighth, in rendering its judgment condemning the defendant.

██ The fourth and fifth errors bring forth the same question which was raised in the cases of *People* v. *Rohena*, 52 P.R.R. 301; *People* v. *López*, 54 P.R.R. 279 and *People* v. *Rotger*, decided on the fifteenth of June (*ante* p. 133) to wit, that in cases where illegitimate children are involved, it is necessary to show their previous acknowledgment, it not being possible to demonstrate that fact in the prosecution followed against the father for an abandonment of minors.

It was held in the aforementioned cases, copying from the syllabus of the second one, that is, *People* v. *López*, 54 P.R.R. 279:

"In a prosecution for abandonment of minors the testimony of the mother as to her relationship with the father of the infants as well as the testimony of other winesses, is admissible evidence.

"The paternity, that is, the parent and child relat:onship that may exist between the defendant and the minor in question, can be established within the prosecution for abandonment of minors (*People* v. *Rohena*, 52 P.R.R. 301, *followed.*)"

No new contention is raised that should demand our consideration. It will suffice then, to refer ourselves to the jurisprudence cited to conclude that said errors were not committed.

██ The sixth and seventh errors refer to the admission of evidence.

In discussing the sixth one appellant limits himself to stating that the court did not permit him to present evidence in regard to his good standing in the community and to quote from Wigmore on Evidence, Section 55, 59 and 1610.

The record shows that upon being called to the stand, witness Miguel Martínez, District Chief of the Insular Police, was questioned in regard to the reputation of the defendant in the community and as to his chastity; that the district attorney objected the question and that the court sustained the objection stating "that it was to be presumed that the defendant observed a good conduct at all times."

Accepting that the error was committed, we do not find that any harm was caused to the defendant since the record also discloses that notwithstanding the objection, the truth is that the witness answered one of the various questions put forth by the defense, in the sense that he had no knowledge of the fact that the defendant had at any time illicit relations with any woman.

 What happened in relation to the seventh assignment was the following:

"Defense: As our last evidence we request the court to make a comparison between the defendant and complainant's children in order to show that there is no resemblance between them.

"District Attorney: We object . . .

"Judge: On what grounds?

"District Attorney: That it is not evidence, in a proceeding of this nature, to prove the relations with the defendant, at the time of conception, with the mother of the children alleged to be those of defendant. The examination requested by the defense does not lie.

"Defense: We have attacked the fact of the paternity of the defendant . . .

"Judge: The position of the court is the following: bring here the children as requested by the defense . . .

"Defense: To see if there exists or not any resemblance between the children and the defendant . . .

"Judge: The court considers that it is not able to determine the physical traits that may exist between children and their parents. Thsee traits vary according to age, development, sometimes due to

sickness, on other occasions by reasons of congenital defects and it is the court's belief that it is not prepared to determine that which has been requested by the defense. It might lead the court to find that they look alike or it might lead the court to decide that there is no resemblance between them . . . The court considers that sometimes a child resembles his mother but not his father. Counsel may present evidence as to whether or not they look alike but it is the court's opinion that it is not prepared to decide that, as it may incur in some error harmful to the rights of the defendant or to the rights of the People.

"Defense: We take exception . . ."

The admission or refusal to admit this kind of evidence has given rise to the most varied decisions.

Summing up the jurisprudence on this matter, Ruling Case Law, in its treatise on illegitimate children, states:

"The question has frequently arisen as to the propriety of exhibiting the child to the jury to enable them to judge from a comparison of its appearance, complexion, and features with those of the defendant, whether any inference can legitimately be drawn therefrom as to its paternity. Although the courts are not in harmony the better rule seems to be that in the case of very young infants, at least, it is improper to exhibit them, on the ground that such evidence is too vague, uncertain, and fanciful, and, if allowed, would establish not only an unwise, but a dangerous and uncertain rule of evidence, and that while it may be a well-known physiological fact that peculiariaties of form, feature, and personal traits are oftentimes transmitted from parent to child, yet it is equally true as a matter of common knowledge that during the first few weeks, or even months, of a child's existence, it has that peculiar immaturity of features which charactertize it as an infant and that it changes often and very much in looks and appearance during that period. Resemblance can then be readily imagined. This is oftentimes the case. Frequently such resemblances are purely notional or imaginary. What may be considered a resemblance by one may not be perceived by another having equal knowledge of the parties between whom the resemblance is supposed to exist. The rule that the exhibition of a very young infant is improper has been applied in the case of a child six weeks old, three months old, nine months old, and about a year old. On the other hand there is considerable authority favoring the rule that a child may be exhibited

to the jury as ev'dence of alleged paternity, and as a rule the authorities have laid down the doctrine flatly with no int'mation that is was in any way affected by the age of the child. The reason for the doctrine is that the we'ght to be given to the testimony is for the jury, and its weakness or uncertainty affords no reason for excluding it. A rule which has received some support is that profert of a bastard child to the jury may be made if the child is of the proper age, as for example if it is of the age of two years. In such a case the child is old enough to have lost the immaturity of features of an infant. If profert is made, the fact that counsel for the plaintiff comments on its resemblance to the defendant is proper, especially where the court instructs the jury that if they do not see the resemblance they must d'sregard the comments. It seems to be generally agreed that a bastard child may be exhibited to the jury when the question is one of race or color of skin, for it is well understood that there are marked distinctions, physical and external, between the different races of mankind, which may enable men of ordinary intelligence and observation to judge whether they are of one race or another. In jurisdictions where the pla'ntiff may make profert of a bastard child for the purpose of showing its likeness to the defendant, the defendant should be allowed to make profert for the purpose of showing its nonresemblance to him or its resemblance to some other person, who had opportun'ties of illicit intercourse with the mother. The better rule and the one supported by the we'ght of authority is that the resemblance or nonresemblance of a bastard child to the defendant cannot be shown by testimony of witnesses, there being no profert of the child, as this is opinion evidence; and especially is this rule applicable where it is sought to introduce testimony as to the color of the hair and eyes for the purpose of showing their resemblances to those of the defendant, for common observation shows that in the same family children often have different colors of hair and eyes, and it would be a dangerous doctrine to permit a child's paternity to be questioned or proved by comparing color of its hair and eyes with that of the alleged parent. Irrespective of whether profert may be made of the bastard child to the jury, or testimony of witnesses received as to its resemblance or nonresemblance to the defendant, the mere presence of the child in court is not prejudicial error to the defendant, when no profert of such child is made, or offered to be made to the jury, and no reference to it, or its presence, is made by counsel to the jury. Nor is it ground of objection that the child whose patern'ty is in question is allowed in its mother's lap during her examination, at least where the court cautions the jury

against considering or discussing any supposed or fancied resemblance or nonresemblance to the defendant; and the child is not tendered in evidence or exhibited to the jury in argument." 3 R.C.L. 764.

And in American Jurisprudence we find the following:

"In general, wherever evidence of resemblance would be admitted to prove paternity and thus to establish the legitimacy or illegitimacy of the child, parties denying such paternity may show that the child bears no resemblance to the alleged father or that it resembles another man with whom the mother may have had intercourse."

". . . there is a decided conflict of the authorities as to the admissibility of evidence of resemblance as bearing on the question of legitimacy, the holdings ranging from an unqualified admission of such evidence to a total exclusion thereof . . ." 7 Am. Jur. 649.

See also 10 C.J.S. 92; 40 A.L.R. 99 and 119, and 95 A.L.R. 317 and 319.

If we examine the judgment of the trial court in the light of the authorities above quoted it might well be decided that it should not have refused to state whether or not the children resembled their alleged father, as it was hearing the case without a jury, that is, as judge of the facts and of the law.

But if it is true that the court stated that "it would not be able to determine that which has been requested by the defense," that is, whether or not they looked alike, because "it may incur in some error harmful to the rights of the defendant or to the rights of The People," it is equally true that it informed the defense "that it could present evidence as to whether or not they looked alike" and the defense did nothing in this regard, limiting himself to note an exception, and it is a fact to be borne in mind that the defendant was not only denying the paternity but trying to prove that the mother of the minors had had intercourse with other men, stating the names of the latter, at the probable time of conception.

Considering all these circumstances and further considering that it is a true fact that the court had before it the alleged father and the children and that although it found that they did not resemble each other it arrived—as it could have arrived by virtue of the other evidence—to the conclusion that the allegation was true, we believe that the error that may have been committed was not prejudicial.

The most that can be agreed upon is that the evidence of physical resemblance or lack of resemblance is admissible in proper cases to be weighed by the trial judge—court or jury—as an element to be considered which is not decisive by itself.

 The remaining errors attack the weighing of the evidence and are the ones most emphatically discussed by appellant in his brief.

After all the evidence had been presented, the trial judge stated the following:

"In the instant case a complaint was filed by The People of Puerto Rico against Arturo Pérez, Insular Policeman, member of an organization which owes great respect to the laws in force in our Island, charging him with an offense of abandonment of minors, based on a .complaint sworn to by Inocencia Peña in the Municipal Court of Fajardo.

"The Municipal Court of Fajardo heard the case and entered judgment against this citizen condemning him to a penalty of thirty days in jail in the District Jail of Humacao.

"The laws in civilized countries must be observed by all. Cit:zens, no matter the position which they may occupy in the government, are bound more than anybody else to see that the laws are obeyed. To take advantage of the position occupied by citizens or to use influence to defeat the aims of the law is to lessen the prestige of the law and to interrupt the admin:stration of justice. To act in this fashion is to demolish the foundations upon which the public security of th:s country should be erected. The spectacle as to this aspect in our country has been painful. Those most obliged to enforce the law, at times take advantage of the positions which they hold to defeat the same, undermining its foundat:ons to such an extreme that the people are on the verge of losing their confidence in the administrat:on of justice. And I believe that the chief responsibility for this state of

conditions and this feeling among the people falls upon the government itself wh'ch actually does not live up to the high agreement which it pledged with society.

"The court deeply regrets that members of the Insular Police should be brought before a court of justice charged with an offense of abandonment of minors. It 's painful to see this and painful for the judge who has to decide cases of this nature, because he would wish that this cases never ocurred; but the laws, as the court has perviously stated, were enacted to be obeyed at all times and in order that every cit'zen should obey and respect the same and especially those who have pledged to society a strict compliance with the laws in our country.

"The court has heard the evidence presented by The People in the case at bar. It has heard the testimony of this woman who testified that she lived in Naguabo, that she bore children of other men, that she met this insular policeman and had marital relat'ons with him in Naguabo and that later on, upon this policeman being transferred to the ne'ghbor town of Fajardo, she moved from the town where she lived, where she had had intercourse with other men and bore them chidren, to Fajardo, a city where she had not lived before. What brought her there? What reason prompted her to move from Naguabo to Fajardo? The court believes and has arrived to the conclus'on that it was due to the marital relations existing between this Insular Policeman and this woman. Such relations continued in Fajardo and when said woman arrived there, it is the court's firm belief that she carried in her womb a child of this c'tizen, a fact which in the natural course of life constitutes no offense; but it is an offense to abandon him and to fail to support him according to the rules of society; and there they had another child. Then we have the testimony of this midwife who has testified in such a way that the court gives full cred't to her as a witness who has come to state the truth before a court of justice under the solemnity of an oath. This midwife testified that she assisted th's woman, that this man was present and that his conduct towards the children was that of parent and child. Another citizen who 's the godfather of one of the children testified and stated that it was he who poured the water on one of the children accord'ng to a very old custom followed among our people when a newly born child is about to die and cannot be taken to church; then a person very close to the family, or any person, is summoned to pour the water on the child, thus establish'ng sacred bonds between the person pouring the water and the parents. He further

testified that he was there and poured the water and established the sacred bonds and saw this policeman, who treated those two children as his own.

"The complainant also testified that it was later, when the policemen was transferred to Patillas, that the relations between them ceased. Then, the absence created certain conditions adverse to the minors on the part of this policeman and she testifies that he then failed to provide for them. Then the conduct of the woman followed, she exercised the right which is inherent to every woman who bears a child to any man. Every man who has a child has the obligation to support him. Modern legislation in every civilized country should do away with the irritant difference established by ancient canons which create distinctions among children, classifying them as legitimate, illegitimate, adulterous and natural children . . . In this country, this kind of legislation must disappear from our codes so that equality among all children be established. They should have, in the light of the law, equal opportunities and privileges. A day will come when society will strike out from the codes the irritant denomination of adulterous, natural and illegitimate children, yet, it still exists in our Civil Code, but our code entitles the adulterous children to receive at least, alimony from their parents.

"The court believes that considering the manner in which the witnesses for the defense have testified, their testimony does not deserve any credit whatsoever. Chauffeurs of common carriers, owners of meat markets, owners of saloons and the like. The court believes that they have come before it more or less moved by the natural interest which arises out of their relations with the policemen, and considering the manner in which they have testified, their testimony is not worthy of any credit whatsoever. It is the court's opinion that all these witnesses have not come to testify what actually happened in this case and the court gives more credit to the wintnesses presented by The People.

"The court considers that the facts are against the defendant and condemns him to pay a fine of $100 or to one day in jail for each dollar which he fails to pay. The law must be observed."

We have read the evidence. We have considered the analysis made of it by learned counsel for appellant in his brief and his remarks in regard to the same and we must conclude that we have to deal with a case of conflicting evidence. If the evidence for the prosecution is believed, it

must be acknowledged that it contains sufficient elements to uphold a judgment of conviction, the judge not being bound to reasonably doubt the paternity imputed to the defendant by virtue of the statements of other witnesses in regard to the relations of the complainant mother with other men or due to the fact that the children did not resemble their father.

Neither we believe that the conclusion should be arrived at that the trial judge was prejudiced against the defendant and that his remarks rendered his judgment void. Perhaps he spoke more than necessary, one may agree more or less with his theories, but nothing that he stated is sufficient to justify, on the part of this Court, the adoption of the conclusions arrived at by the defense in the assignment of errors which we are considering.

The appeal must be dismissed and the judgment appealed from affirmed.

Mr. Justice Wolf dissented.

Mr. Justice Travieso took no part in the decision of this case.